1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

| | | |
|---|---|---|
| COLUMBIA PICTURES INDUSTRIES, INC., *et al.*, | ) ) ) | CV 06-5578 SVW (JCx) |
| Plaintiffs, | ) ) | ORDER GRANTING PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION [395] |
| v. | ) ) | |
| GARY FUNG, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

17
18
19

**I.   BACKGROUND**

20      On December 21, 2009, the Court granted Plaintiffs' Motion for

21  Summary Judgment on Liability (the "Order," docket no. 391), finding

22  that Defendants Gary Fung and Isohunt Web Technologies, Inc.

23  (collectively, "Defendants") induced infringement of Plaintiffs'

24  copyrights in violation of United States copyright law.  <u>See</u> <u>Metro-</u>

25  <u>Goldwyn-Mayer Studios, Inc. v. Grokster</u>, 545 U.S. 913, 125 S. Ct. 2764,

26  162 L. Ed. 2d 781 (2005).  The Court found that "evidence of

27  Defendants' intent to induce infringement is overwhelming and beyond

28

reasonable dispute," Order at 25, and therefore that "Defendants'
inducement liability is overwhelmingly clear," id. at 15.

On the issue of a permanent injunction, the Court has considered
the briefs filed by the parties, the arguments presented at the March
22, 2010 hearing on this matter, and the proposed language and
arguments presented by the parties in response to the Court's proposed
order.  Based on the foregoing and all matters of record in this
action, pursuant to Federal Rule of Civil Procedure 65 and 17 U.S.C. §
502, the Court enters a Permanent Injunction in favor of Plaintiffs and
against Defendants in accordance with the terms contained herein.

**II.  DISCUSSION**

The Court concludes that a permanent injunction should issue to
restrain further infringement of Plaintiffs' copyrights.  Plaintiffs
have satisfied their burden under eBay Inc. v. MercExchange, L.L.C.,
547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006), "(1) that
[they have] suffered an irreparable injury; (2) that remedies available
at law, such as monetary damages, are inadequate to compensate for that
injury; (3) that, considering the balance of hardships between the
plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4)
that the public interest would not be disserved by a permanent
injunction."  Id. at 391.

**A.  Irreparable Harm**

Plaintiffs have demonstrated that they have suffered irreparable
harm, and would suffer further irreparable harm from Defendants'
continued infringement, in three independent ways.  First, given the
staggering volume of infringement of Plaintiffs' copyrights, it is
extremely unlikely that Defendants will be able fully to compensate

Plaintiffs monetarily for the infringements Defendants have induced in the past, or the infringements they could induce in the future.  Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007) ("Grokster V").  Second, given the way in which Defendants' system works, when Defendants' end-users download one of Plaintiffs' works, the end-users automatically and simultaneously further distribute the work to innumerable others as a required part of the download process; additionally, at the conclusion of the download, Defendants' end-users obtain an unprotected digital copy of Plaintiffs' work that those end-users can further distribute indefinitely at will.[1] Thus, when Defendants induce infringement, "Plaintiffs' copyrighted works can be unstoppably and near-instantaneously infringed throughout the computer-literate world with the files obtained by [Defendants'] end-users.  Plaintiffs' power to control their rights has been so compromised by the means through which [Defendants] encouraged end-users to infringe (digital files plus the internet) that the inducement amounts to irreparable harm."  Id. at 1218-19.  Third, it is axiomatic that the availability of free infringing copies of Plaintiffs' works through Defendants' websites irreparably undermines the growing

---

[1]     Defendants argue that the Supreme Court's holding in Grokster was limited solely to "devices" that induce infringement.  Defendants further argue that they are immune from an injunction against their "activities."  (Opp. at 6-7, 19.)
        Defendants' argument lacks merit.  Nothing in Grokster requires that there be a "device"; the central inquiry is based on the defendants' "purposeful, culpable expression and conduct."  Grokster, 545 U.S. at 937.  The Supreme Court's holding in Grokster was not limited solely to "devices."  The Supreme Court used terms such as "device," "product," and "tool" interchangeably.  Id. at 940 n.13. In addition, the clear import of the Supreme Court's opinion was that a defendant may be secondarily liable for his conduct and activities, separate and apart from any products, devices, or tools he distributes.

legitimate market for consumers to purchase access to the same works.
E.g., Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913,
928-29, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005) ("digital
distribution of copyrighted material threatens copyright holders as
never before, because every copy is identical to the original, copying
is easy, and many people (especially the young) use file-sharing
software to download copyrighted works"); A&M Records, Inc. v. Napster,
Inc., 239 F.3d 1004, 1017 (9th Cir. 2001) (citing "Napster's
deleterious effect on the present and future digital download market").

**B.   Inadequate Remedy at Law**

For many of the same reasons,[2] Plaintiffs have demonstrated that
they do not have an adequate remedy at law for the harm that has been
or could be caused by Defendants' infringement.  "'Damages are no
remedy at all if they cannot be collected.'"  Grokster V, 518 F. Supp.
2d at 1219 (quoting Douglas Laycock, *The Death of the Irreparable
Injury Rule*, 103 Harv. L. Rev. 687, 716 (1990)).  Likewise, "[a] legal
remedy is inadequate if it would require a multiplicity of suits."  Id.
at 1220 (quoting Laycock, 103 Harv. L. Rev. at 714) (alteration in
original).

Here, as in Grokster V, "[t]he irreparable harm analysis centers
on two basic themes: (1) [Defendant] has and will continue to induce
far more infringement than it could ever possibly redress with damages;
and (2) Plaintiffs' copyrights (especially those of popular works) have
and will be rendered particularly vulnerable to continuing infringement
on an enormous scale due to [Defendant's] inducement."  Grokster V, 518

---

[2] The "irreparable harm" and "inadequate remedies at law" inquiries
are essentially identical.  Grokster V, 518 F. Supp. 2d at 1219

F. Supp. 2d at 1217.  Both of these elements are present in this case
as well.

In the Summary Judgment Order, the Court concluded that the
evidence "strongly suggests that some 2.5 million United States
citizens visited Defendants' websites each month" and that "at one
point, Defendants' websites were accessed over 50 million times from
the United States in a single month."  Order at 41.  The Court also
concluded that Plaintiffs' statistical evidence showed that over 90% of
the downloads using Defendants' websites were associated with
copyright-infringing materials.  <u>Accord</u> <u>A& M Records, Inc. v. Napster,</u>
<u>Inc.</u>, 239 F.3d 1004, 1013 (9th Cir. 2001)(relying on statistical
evidence to show extent of infringement); <u>Grokster V</u>, 518 F. Supp. 2d
at 1217-19 (same).  Defendants have introduced no evidence to rebut
these showings.

In addition, given the multiplicity of infringements of
Plaintiffs' works caused by a single user downloading a single dot-
torrent file from Defendants' sites, <u>see</u> Order at 6-7, it would be
untenable for Plaintiffs to track and proceed against each infringing
end-user.  Additionally, Plaintiffs would not be able to recover
damages from Defendants for the inevitable derivative infringements
that would occur outside Defendants' websites when copyrighted content
acquired as a result of Defendants' inducement is further distributed
by Defendants' users.  These further infringements are a continuing
threat, making remedies at law insufficient to compensate for
Plaintiffs' injuries.  The only realistic method for remedying such
future harm from Defendants' inducement is by way of a permanent
injunction.  <u>Grokster V</u>, 518 F. Supp. 2d at 1220.

**C.    Balance of Hardships**

The balance of hardships between Defendants and Plaintiffs also warrants the issuance of a permanent injunction.  As described, absent an injunction, Plaintiffs would suffer a severe hardship as a result of Defendants' inducement of infringement.  The injunction being ordered by the Court would not pose a corresponding hardship on Defendants. The Court has already found that Defendants' websites are used overwhelmingly for copyright infringement, with upwards of 95% of all dot-torrent files downloaded from Defendants' websites corresponding to works that are infringing or at least highly likely to be infringing. Summary Judgment Order at 10-11.  Obviously, the harm to Defendants from no longer being able to exploit and profit from that infringement is not a hardship the Court need consider.  See Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824, 829 (9th Cir. 1997) (defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities") (citation and internal quotation marks omitted).  Beyond that, the Court's injunction is limited to Plaintiffs' copyrights and will not substantially interfere with any claimed non-infringing aspects of Defendants' system.

The Court is further persuaded that Defendants would likely continue to induce infringement in the absence of a permanent injunction.  As this Court observed in Grokster:

> [A] successful inducer will sometimes have no need to repeat the infringing message ad infinitum.  This is especially likely to be the case where the product in question is overwhelmingly used for infringing purposes, and requires little or no specialized training to operate.  At a certain point, the inducer can simply continue to distribute the product without any additional active encouragement, recognizing that the marketplace will respond in turn.  Thus, once the market has internalized the inducer's promotion of infringement, the resulting infringements should be

attributable to that defendant even though he/she no longer chooses to actively promote that message.

Grokster V, 518 F. Supp. 2d at 1233-34.

The Court finds those observations fully applicable to this case. For years, Defendants operated their websites as popular destinations for copyright infringement and etched their niche in the market for infringement. Defendants were enormously successful in building a user-base of infringers that, by Defendants' own account, number in the millions. See Order at 42. As stated, the evidence of Defendants' illegal objective was "overwhelming" and the resulting amount of infringement of Plaintiffs' copyrights has been staggering. Defendants' websites "remain[] inexorably linked to [Defendants'] historical efforts to promote infringement." Grokster V, 518 F. Supp. 2d at 1235. Absent an injunction directing Defendants to prevent infringement of Plaintiffs' works, it is highly likely that Defendants' existing users and new users would continue to use Defendants' system to infringe Plaintiffs' copyrights.

Moreover, the Court's conclusion that Defendants are likely to continue to induce copyright infringement is warranted by (1) the great extent to which Defendants have actively encouraged copyright infringement in the past; (2) the fact that Defendants' very business model, at its core, depends upon copyright infringement, and Defendants would financially benefit from further infringement; and (3) the fact that, even since the Court's Order finding Defendants liable for inducing copyright infringement, Defendants have not taken meaningful steps to mitigate the infringement of Plaintiffs' works. Defendants' proposed "primal" or "lite" website contains all of the same indexing and searching functions as the original websites, only with a different

interface for the users to operate.  (See Servodido Reply Decl., Ex. G,
at 15-21.)  In fact, Defendants have not even ceased all of the active
conduct of encouraging and promoting infringement which the Court
specifically identified in its Summary Judgment Order.  A number of
features mentioned in this Court's Summary Judgment Order remain
active: a "top 20" TV shows and movies feature; a "top searches"
feature (which invariably includes all, or almost all, copyrighted
works); and access to Plaintiffs' works that are specifically
identified as the subject of this action.  (Pls. Reply at 10.)
Defendant Fung has affirmatively stated that he will not take steps to
prevent infringement on his websites unless he is ordered to do so by
this Court.  (Fung interview, quoted in Defs. Opp. at 3.)  In short,
Defendants' past and present statements and conduct establish that
Defendants "fully intend[] to continue [their] distribution of the"
tools that are central to their inducement of copyright infringement.
See Grokster V, 518 F. Supp. 2d at 1229-30.

     As this Court explained at length in Grokster V, a defendant who
is liable for inducing infringement may be enjoined from **distributing**
his products in the future, **even if** he no longer promotes an inducing
message.  Although the quote is lengthy, it is worth setting forth in
full:

> The Court is mindful of the following critical passage from the
> Supreme Court's opinion in this case:
>> It is not only that encouraging a particular consumer to
>> infringe a copyright can give rise to secondary liability for
>> the infringement that results. Inducement liability goes
>> beyond that, and the distribution of a product can itself
>> give rise to liability where evidence shows that the
>> distributor intended and encouraged the product to be used to
>> infringe. In such a case, the culpable act is not merely the
>> encouragement of infringement but also the distribution of
>> the tool intended for infringing use.
> Grokster, 545 U.S. at 940 n. 13, 125 S.Ct. 2764.

In effect, the "culpable act," which induces third parties to infringement, certainly manifests itself once two components are present--distribution and promotion/ encouragement. See Amazon.com, 487 F.3d at 727 n. 11; Visa, 494 F.3d at 800-01. It is important to recognize that the Supreme Court did not impose any strict timing relationship between specific acts promoting infringements, distribution, and the direct infringements themselves. For a party to be liable for inducement, distribution may begin prior to any promotion of infringement, distribution and promotion can occur at the same time, and most critically, **distribution can follow past promotion.** This highlighted portion of the above sentence is crucial. As a matter of common sense, a successful inducer will sometimes have no need to repeat the infringing message ad infinitum. This is especially likely to be the case where the product in question is overwhelmingly used for infringing purposes, and requires little or no specialized training to operate. At a certain point, the inducer can simply continue to distribute the product without any additional active encouragement, recognizing that the marketplace will respond in turn.

Thus, once the market has internalized the inducer's promotion of infringement, the resulting infringements should be attributable to that defendant even though he/she no longer chooses to actively promote that message. There is no difference between these infringements and those that are consummated while the defendant is still engaging in the active promotion of infringement.

Critically, Justice Souter recognized the importance of this relationship between past promotion and future distribution during the Supreme Court's oral argument in this case:

> But I don't ... understand how you can separate the past from the present in that fashion. One, I suppose, could say, "Well, I'm going to make inducing remarks Monday through Thursday, and I'm going to stop, Thursday night." The sales of the product on Friday are still going to be sales which are the result of the inducing remarks Monday through Wednesday. And you're asking, in effect--you're asking us--to ignore Monday through Thursday.

Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd., No. 04-480, Mar. 29, 2005 ("Oral Argument Transcript"), at 30. Thus, distribution of a product capable of substantial noninfringing uses, even after the promotion/encouragement of infringement ceases, can by itself constitute inducement. StreamCast's future distribution is undoubtedly connected to past promotional efforts. In its September 27, 2006 Order, this Court recounted in detail, among other undisputed facts, StreamCast's efforts to promote its software to the Napster market as a mechanism for infringing Plaintiffs' copyrighted works. Grokster, 454 F.Supp.2d at 985-86. These promotional efforts proved to be wildly successful, especially because StreamCast marketed itself to Napster users at a particularly important juncture--while Napster was in imminent legal jeopardy. End-user infringement exponentially increased, evidencing that StreamCast's express and implied messages of

promotion were received, absorbed, and responded to by the market. Or as more recently stated by the Ninth Circuit:

> The software systems in ... Grokster were engineered, disseminated, and promoted explicitly for the purpose of facilitating piracy of copyrighted music and reducing legitimate sales of such music to that extent. Most ... users understood this and primarily used those systems to purloin copyrighted music. Further, the ... operators explicitly targeted then-current users of the Napster program by sending them ads for its OpenNap program.

Visa Int'l Serv. Ass'n, 494 F.3d at 801. StreamCast's revenues skyrocketed as a result. Furthermore, StreamCast could not reasonably claim ignorance of the infringements perpetrated by Morpheus endusers. Grokster, 454 F.Supp.2d at 992.

StreamCast has etched its niche in the market for infringement. Under the facts of this case, and the doctrinal point raised by Justice Souter, neither the simple passage of time nor the entry of judgment in this case can remedy StreamCast's past promotion as the "next Napster." The fact that a permanent injunction is imposed also does not leave Morpheus magically reborn as a product safe for unfiltered distribution under Sony. As stated by Justice Scalia to StreamCast's counsel at oral argument, "the point is that those past acts [of encouragement] are what have developed your client's current clientele." Oral Argument Transcript at 29.

. . .

StreamCast is not being "punished" for its past actions; rather, StreamCast's past activity is relevant to what future actions constitute inducement going forward.
An unfiltered Morpheus, which StreamCast intends to distribute if provided the opportunity, necessarily capitalizes on and remains inexorably linked to its historical efforts to promote infringement. The bell simply cannot be unrung. Accordingly, Morpheus's connection to the past promotion of infringement means that StreamCast's continued distribution of Morpheus alone constitutes inducement. This Court is empowered to regulate Morpheus under 17 U.S.C. § 502(a) in order to prevent this distribution from causing future harm to Plaintiffs' rights.

Grokster V, 518 F. Supp. 2d at 1233-35.

**D.   Public Interest**

Finally, the Court agrees that the public interest will be served with a permanent injunction, since it will protect Plaintiffs' copyrights against increased and unrestrained infringement. Id. at 1222.  Although Defendants argue that the BitTorrent "ecosystem" would be harmed by the present injunction, Defendants have not introduced any evidence to show the harmful "wider implications" of this injunction,

10

1   nor have they shown that further discovery is warranted because the

2   relevant evidence is exclusively within Plaintiffs' possession. (See

3   Opp. at 15-17.)   In addition, this injunction is aimed solely at

4   Defendants' unlawful use of BitTorrent and similar technology, not at

5   third parties' lawful use of BitTorrent and similar technology.   The

6   public interest will not be harmed by the injunction.

7            E.    Summary

8        The Court thus finds that the four part eBay test favors the

9   imposition of a permanent injunction to restrain Defendants'

10  infringement.   In its discretion, the Court deems it appropriate for a

11  permanent injunction to issue.

12       In issuing the injunction, the Court is cognizant that "[t]he fact

13  that absolutely perfect compliance is unattainable does not of itself

14  preclude an injunction." Withrow v. Concannon, 942 F.2d 1385, 1388

15  (9th Cir. 1991).   "If a violating party has taken 'all reasonable

16  steps' to comply with the court order, technical or inadvert[e]nt

17  violations of the order will not support a finding of civil contempt."

18  Gen. Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1379 (9th Cir.

19  1986) (citation omitted).   Ultimately, Defendants have the option — and

20  the burden — of deciding how they will comply with the following

21  injunction.   Triad Systems Corp. v. Southeastern Exp. Co., 64 F.3d

22  1330, 1337 (9th Cir. 1995) ("Putting this burden on Southeastern is

23  appropriate because Southeastern is the infringer."), overruled on

24  other grounds by Gonzales v. Texaco Inc., 344 Fed. Appx. 304, 306 (9th

25  Cir. 2009).

26  ///

27  ///

28

**III.  INJUNCTION**

It is therefore ORDERED, ADJUDGED, and DECREED that:

1.    For the purposes of this Permanent Injunction, the following definitions shall apply:

(a)   "Defendants" shall mean Gary Fung and Isohunt Web Technologies, Inc., whether acting jointly or individually.

(b)   "Isohunt System" shall mean the websites www.isohunt.com, www.podtropolis.com, www.torrentbox.com, and www.ed2k-it.com, and shall further include any servers, trackers, software, and electronic data that make up or support such websites.

(c)   "Comparable System" shall mean any website, system or software that provides users access to Plaintiffs' Copyrighted Works, using BitTorrent or any peer-to-peer or other file-sharing or content delivery technology.

(d)   "Copyrighted Works" shall mean each of those works, or portions thereof, whether now in existence or later created, in which any Plaintiff (or parent, subsidiary or affiliate of any Plaintiff), at the time of Defendants' conduct in question, owns or controls a valid and subsisting exclusive right under the United States Copyright Act, 17 U.S.C. §§ 101 et seq., and which Plaintiffs have identified to Defendants by the title of the work.

(e)   "Dot-torrent or similar files" shall mean dot-torrent files, magnet links, hash links, or other functionally similar files, links or identifiers.

(f)   "Infringement-Related Terms" shall mean:

12

(i)  terms that refer to the titles or commonly understood names of Plaintiffs' Copyrighted Works (for example, the full title or common name of a television series);

(ii) terms that are widely known to be associated with copyright infringement (for example "warez," "Axxo," "Jaybob," "DVD Rips," "Cam," "Telesync," "Telecine," "Screener," or "PPV").

2.  Subject to the terms of Paragraph 5 below, Defendants shall be permanently enjoined from knowingly engaging in any of the following activities in connection with the Isohunt System or any Comparable System:

(a)  hosting, indexing, linking to, or otherwise providing access to any Dot-torrent or similar files that correspond, point or lead to any of the Copyrighted Works;

(b)  assisting with end-user reproductions or transmissions of any of the Copyrighted Works through a tracker server, or any other server or software that assists users in locating, identifying or obtaining files from other users offering any of the Copyrighted Works for transmission; or

(c)  hosting or providing access to any of the Copyrighted Works. Defendants shall be in knowing violation of this paragraph if they fail to act in response to the list of titles as set forth in Paragraph 5.1.

3.  Defendants shall immediately and permanently be enjoined from knowingly engaging in any activities having the object or effect of fostering infringement of Plaintiffs' Copyrighted Works, including without limitation, by engaging in any of the following activities:

(a)  advertising or promoting access to or the availability of Plaintiffs' Copyrighted Works;

(b)  encouraging or soliciting users to reproduce or distribute Plaintiffs' Copyrighted Works;

(c)  encouraging or soliciting users to upload, post or index any Dot-torrent or similar files that correspond, point or lead to any of the Copyrighted Works;

(d)  encouraging or soliciting users to link to copies of Plaintiffs' Copyrighted Works;

(e)  providing technical assistance or support services to users engaged in infringement of, or seeking to infringe, Plaintiffs' Copyrighted Works;

(f)  creating, maintaining, highlighting or otherwise providing access to lists of "top" downloads of, or search terms for, Dot-torrent or similar files that include, refer to or signal the availability of Plaintiffs' Copyrighted Works;

(g)  including Infringement-Related Terms in metadata for any webpages;

(h)  creating, maintaining or providing access to browsable website categories of Dot-torrent or similar files using or based on Infringement-Related Terms;

(i)  organizing, harvesting or categorizing Dot-torrent or similar files using or based on Infringement-Related Terms;

(j)  soliciting or targeting a user base generally understood, in substantial part, to be engaging in infringement of, or seeking to infringe, Plaintiffs' Copyrighted Works;

(k)  transferring or redirecting users of the Isohunt System to any other service that, directly or indirectly, provides access to unauthorized copies of Plaintiffs' Copyrighted Works;

(l)  indexing or providing access to Dot-torrent or similar files harvested or collected from well-known infringing source sites, such as "The Pirate Bay";

(m)  soliciting revenue from third party advertisers or advertising brokers based on (or by referring to or highlighting) the availability of Plaintiff's Copyrighted Works.

4.  The terms of Paragraphs 2 and 3 of this Permanent Injunction shall not apply to any Copyrighted Work for which Defendants have obtained express written authorization or license for the use being made of such Copyrighted Work from each Plaintiff that owns or controls the rights to such Copyrighted Work, provided such authorization or license is in force and valid at the time of Defendants' use of the Copyrighted Work.

5.  Defendants shall not be in violation of this Permanent Injunction as to Copyrighted Works that Plaintiffs, or representatives of Plaintiffs, have not (a) identified to Defendants by title of the work, and (b) represented to Defendants that, based on a reasonable review and good faith belief, a Plaintiff (or a parent, subsidiary or affiliate of a Plaintiff) owns or controls a valid and subsisting exclusive right under the United States Copyright Act, 17 U.S.C. §§ 101 et seq. in the work (a "list of titles").

(a)  Plaintiffs shall be permitted to supplement and update their list of titles without restriction, including without limitation with works soon-to-be but not yet released to the public.

(b)  Plaintiffs shall provide Defendants with the list of titles in electronic form.

(c)  Defendants shall promptly provide Plaintiffs with a valid email address to use for the lists of titles, and Defendants shall immediately notify Plaintiffs in writing of any change in such email address.  A list of titles shall be deemed delivered when sent to the most current email provided by Defendants.

(d)  With regard to the initial list of titles provided by Plaintiffs pursuant to this Permanent Injunction, Defendants shall be required to comply with the terms of Paragraph 2 above no later than 14 calendar days from the date Plaintiffs deliver the initial list of titles.

(e)  For all subsequent lists of titles, Defendants shall be required to comply with the terms of Paragraph 2 above no later than 24 hours from the time Plaintiffs deliver the list of titles.

(f)  In the event a commercial vendor or other third party becomes able to provide Defendants with a reliable list of Plaintiffs' Copyrighted Works, Plaintiffs may apply to the Court for an order modifying this Permanent Injunction to relieve them of the obligation of providing Defendants with lists of titles, even if there is a cost to Defendants of securing the lists of titles from the commercial vendor or third party.

6.  Prior to Defendants entering into any agreement or transaction whatsoever to sell, lease, license, assign, convey, give away, distribute, loan, barter, hypothecate, encumber, pledge or otherwise transfer, whether or not for consideration or compensation, any part of the software, source code, data files, other technology, domain names,

trademarks, brands, or Dot-torrent or similar files used in connection with the Isohunt System or any Comparable System (a "Transfer of Isohunt-Related Assets"), Defendants shall require, as a condition of any such transaction, that the transferee:

    (a)   submit to the Court's jurisdiction and venue;

    (b)   agree to be bound by the terms herein; and

    (c)   apply to the Court for an order adding it as a party to this
    Permanent Injunction.

Defendants shall not permit any Transfer of Isohunt-Related Assets to close until the Court has entered such an order. Defendants further shall not engage in a Transfer of Isohunt-Related Assets with or to any person whom Defendants know to be engaged in, or intending to be engaged in, conduct that would violate the terms of Paragraphs 2 or 3 above.

7.   This Permanent Injunction shall bind Gary Fung, individually, and Isohunt Web Technologies, Inc., and their officers, agents, servants, employees, attorneys, successors, and assigns, and all those in active concert or participation with any of them, who receive actual notice of this Permanent Injunction by personal service or otherwise. Defendants shall provide a copy of this Permanent Injunction to each of their respective officers, agents, servants, employees, attorneys, principals, shareholders, current and future administrators or moderators for the Isohunt System (or Comparable System) or any online forums associated with the Isohunt System (or Comparable System), and any domain name registries or registrars responsible for any domain names used in connection with the Isohunt System (or Comparable System).

8.   Nothing in this Permanent Injunction shall limit the right of Plaintiffs to seek to recover damages under 17 U.S.C. § 504, or costs, including attorneys' fees, under 17 U.S.C. § 505.

9.   For purposes of clarity, as the Court has personal jurisdiction over Defendants and has concluded that the conduct of Defendants induces infringement of Plaintiffs' Copyrighted Works in the United States under the copyright laws of the United States, this Permanent Injunction enjoins the conduct of Defendants wherever they may be found, including without limitation in Canada.

10.   The Court further clarifies that this injunction covers any acts of direct infringement, as defined in 17 U.S.C. § 106, that take place in the United States.   To the extent that an act of reproducing, copying, distributing, performing, or displaying takes place in the United States, it may violate 17 U.S.C. § 106, subject to the generally applicable requirements and defenses of the Copyright Act.   As explained in the Court's December 23, 2009 Order, "United States copyright law does not require that both parties be located in the United States.   Rather, the acts of uploading and downloading are each independent grounds of copyright infringement liability."   Summary Judgment Order at 19.   Each download or upload of Plaintiffs' copyrighted material violates Plaintiffs' copyrights if even a single United States-based user is involved in the "swarm" process of distributing, transmitting, or receiving a portion of a computer file containing Plaintiffs' copyrighted content.

11.   Violation of this Permanent Injunction shall expose the Defendants, and all others properly bound by it, to all applicable penalties, including for contempt of Court.

12.   The Court shall maintain jurisdiction over this action for the purposes of enforcing this Permanent Injunction and for amending the injunction in response to future changes in the law or factual circumstances.   See Grokster V, 518 F. Supp. 2d at 1239-40 (collecting cases).

         IT IS SO ORDERED.

DATED:   May 20, 2010                         _____
                                              STEPHEN V. WILSON
                                              UNITED STATES DISTRICT JUDGE